**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **DAVE THOMAS HORN,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:07-0503** |
| | ) | |
| **DAVID BALLARD, Warden,** | ) | |
| **Mount Olive Correctional Complex,** | ) | |
| **Respondent.** | ) | |

## PROPOSED FINDINGS AND RECOMMENDATION

On August 14, 2007, Petitioner, acting *pro se* and incarcerated at Mount Olive Correctional

Complex, Mount Olive, West Virginia, filed a Petition Under 28 U.S.C. § 2254 for Writ of *Habeas*

*Corpus* By a Person in State Custody.[1] (Document No. 1.) Petitioner alleges the following grounds

for *habeas* relief:

1.  Insufficient evidence of malice to support a conviction of second degree murder.
    The mere use of a deadly weapon not in itself is murder. Jury was given an
    instruction that said that malice may be inferred to the intentional use of a
    deadly weapon while malice is an element of murder, the use of a deadly
    weapon itself is not murder under State code. (Document No. 1, p. 5.)

2.  The trial court erred by denying Defendant's Motion to Continue. There was
    gunshot residue forensic test and it was not delivered until the day at trial and
    the court did not give a continuance to have an expert to examine the State's
    evidence. (Id., p. 6.)

3.  Defense counsel was ineffective. The defense counsel did not give a jury
    instruction on a third party defense and it limited the defense by not being able
    to tell the jury that I have the right to defend others as well as myself and to stop
    the commission of a felony crime and did not let me testify after I told him I
    wanted to. (Id., p. 9.)

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held
to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed
liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

4.      The Indictment charging me with murder in the first degree was defective. The West Virginia law does not have [any] such thing as an indictment for first degree murder in West Virginia. The indictment is for murder with the degree dependent upon the evidence presented at trial. Therefore, it was wrong. (Id., p. 39.)

By Standing Order, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 3.)

## PROCEDURAL HISTORY

On December 15, 2000, the Grand Jury of McDowell County, West Virginia, returned an Indictment against Petitioner charging him with one count of "Murder of the first degree." State v.Horn, Criminal Action No. 00-F-130 (Cir. Ct. McDowell Co. May 31, 2001); (Document No. 10-2, Exhibit 1.) Following a jury trial conducted on April 9 - 12, 2001, Petitioner was convicted of Murder of the Second Degree, a lesser included offense. (Id. ) By Order entered May 31, 2001, Petitioner was sentenced to a determinate period of forty (40) years in prison. (Id., Exhibit 2.)

On May 7, 2004, Petitioner, by counsel, James J. Palmer, III, appealed his conviction and sentence to the Supreme Court of Appeals of West Virginia [SCAWV], raising the following assignments of error:

A.      Whether the trial evidence established beyond reasonable doubt that the defendant acted with malice.

B.      Whether the trial court erred in denying defendant's motion to continue in order for trial counsel to conduct an independent gunshot residue test.

(Document No. 10-2, Exhibit 3, pp. 18 - 20, 23 - 30.) The SCAWV refused Petitioner's Petition by Order entered on June 29, 2004. State v. Horn, Case No. 040988 (W.Va. June 29, 2004); (Id., p. 17.)

On January 31, 2005, Petitioner, proceeding pro se, filed a Petition for Writ of Habeas

2

*Corpus* in the Circuit Court of McDowell County. <u>Horn v. Seifert</u>, Civil Action No. 05-C-003 (Cir. Ct. McDowell Co. May 30, 2006); (Document No. 10-2, Exhibit 4, pp. 32 - 34.) By Order entered on February 16, 2005, the Circuit Court appointed counsel, Ronald Hassan, to represent Petitioner. (<u>Id.</u>, p. 35.) On December 6, 2005, Petitioner filed a Supplemental Petition raising the following grounds: (1) Denied impartial and unbiased jury; (2) Insufficient evidence to support verdict; (3) Denied fair trial; and (4) Ineffective assistance of counsel. (<u>Id.</u>, pp. 36 - 57.) The Circuit Court conducted an omnibus *habeas corpus* hearing on April 12, 2006. (<u>Id.</u>, pp. 58 - 78, and Document No. 10-10, Exhibit 8.) During the omnibus hearing, the Circuit Court heard testimony from Petitioner. (<u>Id.</u> ) By Order dated May 30, 2006, the Circuit Court made findings of fact and conclusions of law addressing each ground raised by Petitioner, and denied his *habeas* petition on the merits. (Document No. 10-2, Exhibit 4, pp. 58 - 78.)

On November 30, 2006, Petitioner, by counsel, filed his petition for appeal from the Circuit Court's decision. <u>Allen v. West Virginia</u>, Case No. 063251 (W.Va. Jan. 10, 2007); (Document No. 10-2, Exhibit 5, pp. 82 - 94.) Petitioner alleged the following errors:

1.  At the trial of this case, the State presented insufficient evidence of malice to support a conviction of Second Degree Murder.

2.  The Appellant was denied a fair and impartial jury at the trial of this case.

3.  The Appellant was denied a fair and impartial trial of his case in the lower court.

4.  Defense trial counsel in the lower court was ineffective.

5.  The Indictment of the Defendant in the lower court was defective on its face.

(<u>Id.</u>, p. 3.) The West Virginia Supreme Court of Appeals refused Petitioner's appeal on January 10, 2007. (<u>Id.</u>, p. 81.)

Petitioner filed the instant Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody on August 14, 2007. (Document No. 1.) By Order entered on December 7, 2007, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 5.) On March 18, 2008, in response to the Court's Order, Respondent filed his Consolidated Answer, Motion to Dismiss, Motion for Summary Judgment and Memorandum in Support thereof with exhibits. (Document Nos. 9, 10, and 11.) Respondent contends that his Motion for Summary Judgment should be granted based upon the following: (1) "The evidence was sufficient to establish malice in order to convict Petitioner of second degree murder;" (2) "The trial court did not err in denying Petitioner's Motion for a Continuance . . . [and] any alleged denial of such a motion would not have prejudiced him;" (3) "Petitioner fails to meet the standard set in establishing an ineffective assistance of counsel claim with respect to both his counsel's alleged failure to give a third party defense instruction and the latter's alleged failure to allow him to testify;" and (4) "The Indictment of Petitioner was not defective." (Document No. 11.) On April 25, 2008, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a further response to Respondent's Motion to Dismiss. (Document No. 13.)

On May 2, 2008, Petitioner filed his Response. (Document No. 15.) In response to Respondent's Motion for Summary Judgment, Petitioner first contends there was insufficient evidence to establish malice because there was testimony that the victim had a violent reputation and Petitioner was "fearful for his life." (Id. , p. 3.) Second, Petitioner asserts there is a genuine issue of material fact as to whether trial counsel sought a continuance in the underlying criminal trial. (Id., p. 7.) Petitioner argues that defense counsel requested a continuance "to have an independent expert

4

examine the gunpowder residue kit." (Id. ) Third, Petitioner claims that "the lack of a 'Third Party Defense Instruction' did prejudice petitioner in his defense because by the giving of only a 'Self Defense Instruction' limited the petitioner to a defense of self defense, when clearly, by the State's own admission, he was entitled to a 'Third Party Defense Instruction' because he was defending a friend." (Id. , p. 12.) Petitioner further alleges that trial counsel acted ineffectively by failing to "put petitioner on the stand to testify." (Id. , p. 14.) Finally, Petitioner asserts that his Indictment was defective because "under the law in West Virginia 'there is no such thing as an indictment for first or second degree murder.'" (Id. , p. 16.)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a state prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a § 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of

5

materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. <u>Id.</u> In determining whether the State Court's decision was contrary to, or was an unreasonable application of, Supreme Court precedent, all factual determinations by the State Court are entitled to a presumption of correctness. 28 U.S.C. § 2254(e).[2] On this framework, consideration should be given to Respondent's Motion to Dismiss and for Summary Judgment.

**<u>Summary Judgment</u>**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims,

---

[2] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322 - 23, 106 S.Ct. at 2552 - 53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 - 48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

## FACTUAL BACKGROUND

On July 29, 2000, Petitioner shot and killed Kenneth Asbury in Newhall, West Virginia. Prior to the above shooting, Doug Asbury, Kenneth's brother, was involved in a fight with Ebbie Rambo during a party in Tunnel Hill.[3] Doug was intoxicated and lost the fight. Doug then left the party, went to Virginia to get a gun, and returned to Newhall looking for Ebbie. Doug and Kenneth proceeded to the Number 3 Bottom of Newhall looking for Ebbie. Doug and Kenneth found Ebbie in the Number 3 Bottom area near Petitioner's residence. A dispute allegedly occurred in front of Petitioner's residence and Petitioner warned the parties to leave because he had called the police. The parties then proceeded across the bridge to the Number 2 Bottom where the parties continued

---

[3] Neither Petitioner nor Kenneth was at the party.

to argue.  Kenneth was subsequently shot and killed by Petitioner.

Doug Asbury testified that he was the brother of the victim, Kenneth. (Document No. 10-6, Exhibit 6, p. 15.) Doug testified that on the evening of July 29, 2000, "[m]y father and I went down to Gary Leak's down at Tunnel Hill to drink some beer and socialize." (Id., p. 18.) Doug stated that his brother, Dennis, and Dennis' girlfriend were also at the party. (Id., pp. 19 - 20.) Doug testified that Petitioner was not at the party on the night in question. (Id., p. 29.) Doug stated that during the party, "me and Ebbie Rambo got into an argument, which led into a fist fight." (Id, p. 21.) Doug acknowledged that "Ebbie got the best of it." (Id.) Doug conceded that he was angry after he lost the fight and stated that "this isn't over." (Id., p. 47.) Doug stated that he left the party with his dad and Dennis after the fight. (Id., p. 22.) Doug testified that he could not find his truck keys, so he rode with Dennis. (Id.) Doug testified he found his keys in his pocket during the drive home, so they dropped his dad off at home and proceeding to Dennis' girlfriend's residence where they got a gun. (Id., pp. 23 - 24.) Doug explained as follows: "Well, I went up there to get a gun because when I went back I was afraid that me and Ebbie would get into it again; so, I went up and got a gun and was going to go back and get my truck." (Id., p. 23.) Doug stated that on the way back to get his truck, he stopped "at home" and Kenneth was there and decided to go with him and Dennis. (Id., pp. 25 - 26.) Doug testified that upon arriving at Mr. Leach's residence, he "asked Gary or one of them if they knew where Ebbie was . . . Gary said he was either in the bottom or up at I believe his brother's." (Id., pp. 26 - 27.) Doug stated that Dennis "went home," and he and Kenneth proceeded to "the Bottoms" in his truck. (Id., p. 27) Doug acknowledged that he went to "the Bottoms" with the intention of beating or killing Ebbie. (Id., p. 49.) Doug testified that he and Kenneth drove to the Third Bottom and "went all the way to the end and turned around." (Id., p. 28.) Doug stated that

on the way out of the Third Bottom he "saw Mr. Rambo's vehicle with Sean Johnson sitting under the steering wheel, and I asked him where Ebbie was." (<u>Id.</u>, p. 30.) Doug testified that Mr. Johnson "said that Ebbie was down in the Second Bottom. So, we proceed on down that way." (<u>Id.</u>, p. 33.) Doug stated that he did not get out of his truck when he spoke to Mr. Johnson. (<u>Id.</u>, p. 31.) Doug testified that Ebbie's car was parked in front of Petitioner's residence and was "pointed, like you were going into Third Bottom." (<u>Id.</u>, p. 30.) Doug stated they proceed past Petitioner and Mr. Amos's residence, crossed the bridge, and stopped on the other side. (<u>Id.</u>, p. 33.) Doug testified that they stopped on the other side because he "saw Ebbie down in - down in Second Bottom with a baseball bat." (<u>Id.</u>) Doug stated Ebbie "was coming towards my truck shouting profanities" and "I took the shogun out of the truck, and proceeded over there and pointed it at him." (<u>Id.</u>) Doug acknowledged that Kenneth also got out of the truck and "walked around to the side of the truck where I was at and stood there." (<u>Id.</u>, p. 34.) Doug stated that they continued to exchange words and "I pointed the shotgun at him, and then, something just told me, said that it's not worth it, and I threw the shotgun back in the back of the truck, and proceeded – We were getting in the truck to leave." (<u>Id.</u>) Doug testified that he went to the driver's side and Kenneth went to the passenger's side of the truck and the following occurred:

> Ebbie started shouting more profanities, and I shouted some back at him, and then I heard a shot – a shot it sounded like from a pretty good distance away. At that time, my brother said, "I've been shot." And I proceeded to go around the truck and try to help him. . . He was on the ground, unconscious.

(<u>Id.</u>, p. 34 - 35.) Doug testified that "I went over and was trying to get him up and get him in the back of the truck, and I felt his intestines coming out of his stomach, and I was trying to hold them in and trying to drag him to the truck to help him into the back of the truck to take him to the hospital." (<u>Id.</u>, p. 38.) Doug testified that Kenneth did not have possession of a gun at the time he

9

was shot. (Id., p. 36.) Doug stated that he did not see who shot Kenneth. (Id., pp. 37 - 38.) Doug testified that neither he nor Kenneth fired the shotgun on the night in question nor pointed a gun at Petitioner. (Id., pp. 32, 42.)

Ebbie Rambo testified that he attended the party at Mr. Leak's residence on the evening of July 29, 2000. (Document No. 10-7, Exhibit 6, p. 39.) Ebbie stated that he "knocked-out" Doug at the party and Doug warned him that "this ain't over, we'll be back." (Id., p. 44.) Ebbie acknowledged that both he and Doug were intoxicated. (Id., p. 45.) Ebbie testified that he subsequently left the party, but returned later that night. (Id., pp. 47 - 50.) Upon returning to the party, Ebbie testified that Mr. Leak warned him that the Asburys were looking for him in the Bottoms. (Id., p. 50 - 52.) Ebbie stated that he had Mr. Johnson drive him to the Bottoms because he didn't want the Asburys causing problems with the people living in the Bottoms. (Id., p. 52.) Ebbie testified that he was residing in the Third Bottom area with Doodle Barton on July 29, 2000. (Id, pp. 35 - 36.) Ebbie stated that Doodle's residence was four above Mr. Amos's residence. (Id., p. 36.) Ebbie testified that as he and Mr. Johnson drove up into the Bottom, they saw Doug and Kenneth coming out of the Bottom. (Id., p. 53.) Ebbie stated that Doug and Kenneth "pulled up in front of my car." (Id., pp. 53, 56.) Ebbie testified that the following occurred:

> [T]he truck stopped, Kenneth jumped out of the truck, and Doug got out, and I seen a gun coming out of the truck, and I looked at Sean, and I said run, they've got a gun; so, I jumped out of the car and run back across this bridge, and I hollered, I said, somebody call the law, they've got a gun, and I come down here in this bottom in front of Glen Collins' house and was standing, that's down from – No. 2 Bottom.

(Id., p. 57.) Ebbie stated that Kenneth had the gun when he first got out of the truck in the Third Bottom. (Id., p. 58.) Ebbie testified that Doug and Kenneth were yelling something, but he could not make out what they were saying because he was running across the bridge. (Id., p. 61.) Ebbie

stated that Doug and Kenneth then got back in the truck and drove across the bridge and stopped. (Id. , p. 62.) Ebbie testified that "Kenneth got out on the passenger's side, and Doug got out on the driver's side, and Doug come around to the front of his door, and me and Doug were arguing." (Id., p. 62.) Ebbie testified that Doug did not have a gun and he could not see "most of [Kenneth's] body" because the truck was blocking his view. (Id. , pp. 63 - 64.) Ebbie testified that Doug and Kenneth "got back in the truck, and proceeded to go up the hill, and then they stopped behind, right straight behind like Bruce Tester's house, and there's an opening. . . . [A]fter they sat there a couple of minutes they backed back down the hill, and Doug got back out of the truck." (Id. , pp. 65 and 67.) Ebbie stated that he did not see Kenneth anymore, but he must have been out of the truck because "I didn't see him in the truck." (Id. , p. 70.) Ebbie testified that he and Doug continued to argue back and forth, but Doug did not have a weapon. (Id. , pp. 70, 85) Ebbie then stated that the following occurred:

> [T]he next thing I know, Doug hollered out. He said, Ebbie, he said, my brother's been shot, which I didn't hear the shot where we were hollering back and forth. I mean, we were screaming at each other, and I thought he was lying to get me to come up there to shoot me. So, you know, I said "f" you, "f" your brother, which I didn't know his brother, you know, had been shot or nothing like that and, then, I seen this trooper pulled up, come up in a cruiser; so, I walked up.

(Id. , p. 71.) Ebbie acknowledged that he never saw Kenneth do anything to threaten Petitioner. (Id. p. 100.)

Michelle Horn, Petitioner's wife, testified that on the night of July 29, 2000, she and Petitioner heard Ebbie screaming "call the law, he's got a gun, he's going to kill me." (Document No. 10-8, Exhibit 6, p. 2.) Mrs. Horn stated that she looked out the window and saw Doug's truck in front of Ebbie's car, which was stopped in the middle of the road between her house and Mr. Amos' house. (Id. , pp. 3, 11.) Mrs. Horn testified the Petitioner told her to call the police and she

called 911. (Id. , pp. 6 - 7.) Mrs. Horn stated that Petitioner then told the parties to leave that "we had called the law." (Id. p. 7.) Mrs. Horn testified that she saw "a guy on the passenger's side of the truck out with a gun." (Id. , p. 12.) Mrs. Horn stated that Ebbie was just standing there and the man on the passenger's side pointed the gun at Ebbie. (Id. , p. 15.) Mrs. Horn testified that Petitioner told them to leave a second time, and "the guy turned and pointed the gun at Dave." (Id. , p. 17.) Mrs. Horn explained that Petitioner had turned around and was returning to the house and the guy "pointed it towards Dave's back." (Id. , p. 18.) Mrs. Horn stated at that point, Ebbie ran across the bridge to the Second Bottom. (Id. ) Mrs. Horn testified that she told Petitioner "that he pointed the gun at him, and then, the guys got in the truck . . . and were going like they were leaving the bottom." (Id. , p. 32.) Mrs. Horn stated that the truck started up the hill out of the Bottom, the truck stopped just for a moment, and then it backed down the hill. (Id. , p. 36.) Mrs. Horn then testified that she observed the following: "I seen Dave at the garage. I seen the truck across the bridge. I see the guy on the passenger's side out with a gun." (Id. , p. 42.) Mrs. Horn stated that Kenneth had the gun and "was looking in Ebbie's direction." (Id. , p. 45.) Mrs. Horn testified that Dave then proceeded to the bridge and "told them, we've called the law, leave." (Id. , p 43.) Mrs. Horn stated that Kenneth pointed the gun at Petitioner and she "heard the shot." (Id. , p. 49.) Mrs. Horn explained that she "had to look to see if it was Davie that had been shot," but "[h]e was still standing, and I looked, and I seen the other guy fall." (Id. ) Mrs. Horn testified that "Dave come back in. He laid the gun on the bed, and he called 911." (Id. , p. 50.) Mrs. Horn stated that she heard only one shot. (Id. , p. 64.) Mrs. Horn acknowledged that she did not tell Trooper Cooper in her statement that Kenneth pointed a gun at Petitioner. (Id. , p. 71.)

Sam Amos testified that he lives in the "first house in the Third Bottom." (Document No.

12

10-3, Exhibit 6, p. 120.) Mr. Amos stated that he was Petitioner's next door neighbor. (Id. , p. 123.)

Mr. Amos testified that on July 29, 2000, he was awakened by a noise outside. (Document No. 10-4,

Exhibit 6, pp. 2 - 3.) Mr. Amos stated that he stepped outside and saw Petitioner with a shotgun

walking toward the bridge. (Id. , p. 3.) Mr. Amos testified that Petitioner yelled that he was going

to shoot, and "[a]bout that time, he shot, and the man fell." (Id. ) Mr. Amos stated that he heard one

gunshot and it was the gunshot that Petitioner fired. (Id. , p. 29.) Mr. Amos stated that the area was

well lit with street lights and he could clearly see Petitioner. (Id. , p. 4.) Mr. Amos testified that

Kenneth was "across the road beside the bridge, about middle ways of the road." (Id. , p. 5.) Mr.

Amos stated that "I seen both his hands, both his arms just as plain as you see mine here" and

Kenneth did not have a gun. (Id. , pp. 6 - 7, 9.) After Kenneth was shot, Mr. Amos testified that

Petitioner and Mr. Johnson returned to Petitioner's residence. (Id. , p. 7.)

Trooper Aaron Cooper testified he was serving subpoenas in the Newhall area when he was

requested to respond to the 911 call. (Id. , pp. 69 - 70.) Trooper Cooper stated that it took him

approximately six minutes from the time he was requested to respond until he arrived on the scene.

(Id. , p. 71.) Upon arriving on the scene, Trooper Cooper testified that he observed the following:

> When I arrived on-scene, I observed the victim laying face down in the back of a red
> pick-up truck with his legs hanging off the tailgate. There was an individual later
> identified as Ebbie Rambo at the initial scene. He was in a heightened state of
> excitement, appeared to be intoxicated. I, also, spoke to the victim's brother, Douglas
> Asbury.

(Id. , p. 72.) Trooper Cooper testified that Doug appeared to be intoxicated. (Id. , p. 73.) Trooper

Cooper stated that he examined Kenneth's gunshot wound and "observed a large mass of intestine

protruding out from his abdomen onto the tailgate of the truck." (Id. ) Trooper Cooper testified that

he called for an ambulance and once the ambulance arrived he secured the scene and began his

13

investigation. (Id. , p. 74.) Trooper Cooper stated that he concluded that Kenneth was standing on the passenger's side of the truck when he was shot. (Document No. 10-5, Exhibit 6, pp. 14 - 15.) Trooper Cooper stated that he attempted to interview Ebbie, but he was "totally incoherent" and "I couldn't make anything out on what he was saying." (Document No. 10-4, Exhibit 6, p. 75.) Trooper Cooper testified that he took possession of a 12 gauge, single action shotgun, which was located in the back of the red truck. (Id. , pp. 77 - 78.) Trooper Cooper stated that the shotgun was loaded with a live round, but he found no spent casing or other evidence that the gun had been fired. (Id. , p. 78.) Trooper Cooper testified that after collecting the shotgun from the Asbury's truck, he proceeded across the bridge to Petitioner and Mr. Amos' residences. (Id. , p. 82.) Specifically, Trooper Cooper explained as follows:

> When I crossed the bridge, there was a large group of people standing in front of Mr. Horn's residence. I crossed the bridge with intentions of asking the people if they may have witnessed anything, and upon walking across the bridge, I was confronted by Mr. Horn, and he advised me that I was the one he was looking for and advised that he had shot the victim.

(Id. , p. 82 - 83.) Trooper Cooper further testified that "after speaking with Mr. Horn, he advised him where the spent casing was from his shotgun, where his shotgun was, I collected those items, as well." (Id. , p. 82.) Trooper Cooper then stated that he advised Petitioner that he was under arrest for murder and placed Petitioner in the back of his car. (Id. , p. 83.) Upon leaving the crime scene, Trooper Cooper transported Petitioner to the state police detachment in Welch to complete the arrest process and to administer a gunpowder residue kit. (Document No. 10-5, Exhibit 6, pp. 6, 18, 24.) Trooper Cooper testified that Petitioner was then transported to the McDowell County Jail in the early morning hours of July 30, 2000. (Document No. 10-4, Exhibit 6, p. 46 and Document No. 10-5, Exhibit 6, p. 24.) Trooper Cooper stated that he later traveled to the McDowell County Jail in

14

order to speak with Petitioner concerning the shooting. (Document No. 10-4, Exhibit 6, p. 46 and

Document No. 10-5, Exhibit 6, p. 25.) Trooper Cooper testified that Petitioner volunteered to give

a statement and was again advised of his rights. (Document No. 10-4, Exhibit 6, pp. 46, 50.) Trooper

Cooper stated that Petitioner acknowledged he understood his rights and signed the Wavier of Rights

Form. (Document No. 10-4, Exhibit 6, pp. 49 - 50 and Document No. 10-5, Exhibit 6, p. 29 - 32.)

Trooper Cooper testified that he "asked Mr. Horn, basically, to describe to me in his own words his

account of the incident as it occurred, and I wrote down word for word what he said." (Document

No. 10-4, Exhibit 6, p. 52 and Document No. 10-5, Exhibit 6, p. 32.) Trooper Cooper testified that

Petitioner gave the following statement:

> Today, while at the McDowell County Jail, Trooper Cooper came to speak
> to me about the incident that occurred last night in No. 3, Newhall. I told Trooper
> Cooper that Ebbie Rambo came into the hollow and the fellow that I shot was
> coming out of the hollow. They stopped in front of my house. I heard Ebbie holler
> for me saying, call 911, he's got a gun, and at that point, I went outside to make them
> quit fighting outside my house. They were across the bridge at that time. They were
> chasing Ebbie around No. 2. Then I stepped to the edge of my property. At that
> point, I told the guy that I had called the law. At that point, the other guy turned
> toward me and acted like he was going to shoot. At that point, I shot the other guy.
> After I shot the guy, he went down. I called 911 again and told them – told
> the lady that I needed an ambulance and law to come to the scene. I also told the lady
> that I had shot the guy. The lady told me that a trooper was on-scene and asked me
> to walk out to meet him. I told the lady that the guy's brother was out there, and I
> feared that he might shoot me. I then waited in my house until the trooper came over.
> When I saw the trooper outside, I walked out and told him that I had shot the guy.

(Document No. 10-5, Exhibit 6, pp. 36 - 37.)

Sergeant John Giacalone testified that he works in the crime and forensic laboratory at the

West Virginia State Police headquarter. (Document No. 10-5, Exhibit 6, p. 102.) Sergeant Giacalone

stated that he examined two gunpowder residue kits in the underlying investigation: one taken from

Petitioner, and one taken from Kenneth. (Id. , p. 103.) Sergeant Giacalone testified as follows

concerning the gunpowder residue kit performed on Petitioner: "On the - of the three samples, right hand, left hand and face of David Horn, State's Exhibit No. 9, I located a particle of gunshot residue on the right hand sample, and there were, also, lead particles on all three samples." (Id. , p. 110.) Regarding the gunpowder residue kit performed on Kenneth, Sergeant Giacalone stated as follows: "On the samples of the right hand, left hand and the face of Kenneth Asbury, I was not able to locate any of these articles of gunshot residue." (Document No. 10-6, Exhibit 6, p. 2.)

Dr. Zia Sabet, Deputy Chief Medical Examiner of the State of West Virginia, testified that he performed an autopsy on Kenneth. (Document No. 10-6, Exhibit 6, pp. 86, 90.) On external examination, Dr. Sabet stated that he observed the following:

> I saw that part of the small intestine protruded from the hole, which was about 1 by 1 and quarter of inch in diameter, just below the abdominal region, and it was about 29 inches from top of the head, that area on the midline on the anterior abdomen, midline in front and back, and small pieces of fragment of the – or loop of the small intestine, also, shaded with mesentery, which is part of small bone and omentum, which is a membrane of the abdomen that protruded from his hole.

(Id. , p. 92.) Dr. Sabet testified that Kenneth's gunshot wound was caused by a rifled shotgun with a rifled slug. (Id. , p. 95.) Dr. Sabet described the entrance wound as being "just under his belly button." (Id. , p. 95.) Dr. Sabet described the trajectory of the gunshot as follows: "This is a shotgun, and a shotgun injury, the direction was front to back because of the fragmentation pieces and from left slightly left to right. So, the direction was just front to back and slightly left to right." (Id. , p. 103.) Dr. Sabet testified that he recovered "seven pieces of his single slug inside the right pelvis." (Id. , p. 97.) Dr. Sabet stated that he conducted a gunpowder residue kit on Kenneth's hands and face. (Id. , p. 99.) Dr. Sabot further testified that the toxicology report revealed that Kenneth had a

16

blood alcohol level of .22.[4] (Id., p. 102.) Dr. Sabot stated that the victim "died of a single shotgun

wound of the abdomen and the manner of this I classified as homicide." (Document No. 10-7, p. 2.)

## ANALYSIS

**A.     Timeliness of Federal *Habeas* Petition.**

Although Respondent does not assert the statute of limitations as an affirmative defense, the

undersigned will consider the timeliness of Petitioner's federal *habeas* petition.[5] The court is

permitted to consider the statute of limitation defense *sua sponte* when the defense is plain from the

face of the petition. Day v. McDonough, 547 U.S. 198, 207, 126 S.Ct. 1675, 1682,164 L.Ed.2d 376

(2006)("District courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a

state prisoner's *habeas* petition, even after the pre-answer, initial screening stage of the *habeas*

proceedings.) In Eriline Co. S.A. v. Johnson, 440 F.3d 648, 655 (4th Cir. 2006), the Fourth Circuit

stated as follows:

> Although a court generally possesses no strong institutional interest in the
> enforcement of a statute of limitations, we have recognized that a statute of
> limitations defense may be properly raised *sua sponte* by a district court in certain
> narrow circumstances. Specifically, we have permitted *sau sponte* consideration of
> the statute of limitations when such a defense plainly appears on the face of either
> a petition for *habeas corpus* filed pursuant to 28 U.S.C. § 2254, see Hill v. Braxton,
> 277 F.3d 701, 706 (4th Cir. 2002), or a complaint filed in forma pauperis pursuant to
> 28 U.S.C. § 1915, see Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 953
> - 54 (4th Cir. 1995).

The "statute of limitation defense is not jurisdictional, hence courts are under no obligation to raise

---

[4]  Dr. Sabet testified that he estimated that Kenneth had drunk approximately eleven cans of beer. (Document No. 10-6, p. 102.) He explained as follows: "[A] can of beer contains .02 percent of alcohol; so, .22 means about eleven cans of beer in the system." (*Id.*)

[5]  In the Respondent's Answer, he appears to concede that Petitioner's Petition is timely. (Document No. 9.) Specifically, Respondent states as follows: "Based upon the Procedural History as set forth in Respondent's Memorandum of Law, it appears that the present federal petition was timely filed within the one-year period of limitation prescribed by 28 U.S.C. § 2244(d)." (*Id.*, p. 1.)

the time bar *sua sponte*." Day, 547 U.S. at 205, 126 S.Ct. at 1681.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 [AEDPA], effective April 24, 1996, provides that Section 2254 *habeas* petitions must be filed within one year after "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[6] If the Petitioner does not petition for a Writ of Certiorari in the United States Supreme Court upon the denial of direct review in the highest State court, then the one-year limitation period begins to run 90 days after judgment is entered in the highest State court (i.e., when the period for filing a petition for a Writ of Certiorari in the United States Supreme Court expires). See Harris v. Hutchinson, 209 F.3d 325, 328 (4th Cir. 2000).

---

[6] Title 28, United States Code, Section 2244(d)(1) provides as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Petitioner did not file a direct appeal of his conviction to the SCAWV until May 7, 2004.[7] The undersigned notes that Petitioner was convicted on April 12, 2001, and sentenced on May 31, 2001.[8] The circuit court resentenced Petitioner on January 14, 2002, and on February 27, 2004, for the sole purpose of reinstating his appeal rights. (Document No. 10-2, Exhibit 3, pp. 21 - 22.) "[A] state court's reinstatement of direct appeal rights does not give a federal *habeas* petitioner a fresh limitations period under § 2244(d)." Nash v. Thurmer, 2007 WL 4418191 (E.D. Wis. Dec. 17, 2007); also see Teas v. Endicott, 494 F.3d 580, 581 (7th Cir. 2007)(rejecting petitioner's argument that his success in gaining reinstated direct review from the state court restarted his Section 2244(d) clock); Salina v. Dretke, 354 F.3d 425, 429 (5th Cir. 2004)(rejecting petitioner's argument that the reinstatement of his appeal rights "de-finalized" his judgment and restarted the AEDPA clock); Rivera v. Krysevic, 2008 WL 2563249 (M.D.Pa. June 24, 2008)(holding that the reinstatement of petitioner's appeal rights did not toll the statute of limitations); Reynolds v. United States, 2007 WL 274804 (W.D.N.C. Jan. 26, 2007)(stating that "if Courts were to reward petitioner for filing out-of-time appeals by allowing such untimely appeals to restart the one-year statute of limitations clocks, cases where petitioners failed to timely note their appeals would remain unresolved, or otherwise subject to direct attack at the sole discretion of the petitioner"). Therefore, the undersigned finds that Petitioner's conviction became final by the expiration of the time for seeking direct review, on

---

[7] Although it appears that Petitioner filed his "Notice of Intent to Appeal" on July 2, 2001, Petitioner did not file his Petition for Appeal until May 7, 2004. Rule 37 of the West Virginia Rules of Criminal Procedure provides that "[a] petition must be filed with the clerk of the circuit court where the judgment, decree or order being appealed was entered within four months of the entry of the circuit court order."

[8] The undersigned's staff obtained a copy of the docket sheet for the underlying criminal case by contacting the Circuit Clerk of McDowell County. The docket sheet will be filed as an Exhibit.

September 30, 2001 (four months after Petitioner was convicted and sentenced in the Circuit Court of McDowell County).[9] Accordingly, pursuant to Rule 6(a) of the Federal Rules of Civil Procedure,[10] the one-year statute of limitation began to run on October 1, 2001, and Petitioner had until October 1, 2002, to file a Section 2254 Application in the United States District Court, unless he first sought post-conviction relief from the State courts. Petitioner filed his State *habeas* Petition on January 31, 2005. Accordingly, the one-year limitation period expired prior to Petitioner filing his State *habeas* Petition. Since Petitioner did not file his direct appeal or State *habeas* Petition prior to October 1, 2002, the one-year limitation period was not tolled. Therefore, the undersigned finds that Petitioner's Section 2254 *habeas* Petition was filed outside the limitation period under 28 U.S.C. § 2244(d).

     Nevertheless, the one-year limitation period may be subject to equitable modification in

---

[9] Rule 37(b)(3) of the West Virginia Rules of Criminal Procedure provides:

(3) Time for Petition for Appeal. - A petition must be filed with the clerk of the circuit court where the judgment, decree or order being appealed was entered within four months of the entry of the circuit court order. The appeal period may be extended, upon request of the appealing party, within four months of the order appealed from for the purpose of preparing a transcript or for good cause, for a period or periods not to exceed a total of two months. When an appeal by the state is authorized by statute, the petition for appeal shall be filed with the clerk of the circuit court within 30 days after entry of judgment or order appealed from.

[10] Rule 6(a) of the Federal Rules of Civil Procedure provides in part, as follows:

(a) **Computation**. In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which the weather or other conditions have made the office of the clerk of the district court inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

appropriate cases. See Harris, 209 F.3d at 328-31. The doctrine of equitable tolling has generally been applied in two distinct situations. First, the doctrine has been applied in situations where the petitioner was prevented from asserting his claims due to the respondent's wrongful conduct. Id. at 330. Second, the doctrine has been applied in situations where the petitioner was prevented from asserting his claims due to circumstances beyond his control. Id.

> [A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes. To apply equity generously would loose the rule of law to whims about the adequacy of excuses, divergent responses to claims of hardship, and subjective notions of fair accommodation. We believe, therefore, that any resort to equity must be reserved for those rare instances where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice would result.

Harris, 209 F.3d at 330. The undersigned finds that Petitioner has not presented "extraordinary circumstances" beyond his control to justify invoking the doctrine of equitable tolling. An apparent misunderstanding of the statutory limitation period, no matter how innocent it may be, does not constitute "extraordinary circumstances" beyond Petitioner's control to justify equitable tolling of the limitation period.

> [T]the mistake in this case is not extenuated by any lack of clarity in the statute. The language of §§ 2244(d) provides unambiguously that the one-year period within which a federal habeas petition must be filed commences on the "conclusion of direct review." This language does not contribute to a misunderstanding that would have the time commence on the "conclusion of State post-conviction proceedings.

Harris, 209 F.3d at 331. Furthermore, the particular "facts and circumstances" of Petitioner's case do not warrant equitable tolling. Petitioner's instant Petition was filed nearly five years after the Section 2244(d) one-year period expired. The undersigned further notes that Petitioner's State *habeas* Petition was filed nearly two years and three months after the Section 2244(d) limitation

period expired. Accordingly, Petitioner's Section 2254 Petition must be denied as untimely.

Notwithstanding the determination that Petitioner's Section 2254 Petition is untimely, the undersigned will address the merits of Petitioner's claims.

**B.**   **Sufficiency of the Evidence.**

Petitioner contends that there was insufficient evidence of malice to support his conviction of second degree murder. (Document No. 1, p. 5.) Specifically, Petitioner argues that "the mere use of a deadly weapon is not in itself murder." (Id. ) Based on the following testimony, Petitioner alleges there was insufficient evidence of malice: (1) "Ebbie Rambo testified that prior to the shooting, he was warned that Doug and Kenneth Asbury were looking for him to kill him;" (2) Michelle Horn testified that "Mr. Asbury pointed the gun at her husband's back;" (3) Dr. Sabet's testimony concerning the "trajectory is entirely consistent with Mr. Asbury being in a shooter's stance;" and (4) Doug Asbury "admitted his brother aimed his shotgun at their intended victim, Ebbie Rambo, shortly before petitioner discharged his weapon." (Document No. 15, pp. 3 - 5.)

In response, Respondent argues that the "evidence was sufficient to establish malice in order to convict Petitioner of second degree murder." (Document No. 11, p. 7.) Specifically, Respondent contends that "there was sufficient evidence to establish the element of malice whereby, examining the case in the light most favorable to the prosecution, a rational trier could convict Petitioner of second degree murder." (Id. , p. 9.) Respondent states that the evidence revealed that "Petitioner shot an unarmed man while the latter and his brother were leaving an area." (Id. )

The State *habeas* court determined that "the State had provided sufficient evidence to prove beyond a reasonable doubt that Horn maliciously shot Kenneth Asbury." (Document No. 10-2, Exhibit 6, p. 71.) Specifically, the circuit court found as follows:

22

In the case at bar, the jury could infer malice pursuant to the holding in Carey. The State had proved that Horn shot Kenneth Asbury with a shotgun, fatally wounding him. In fact, according to Trooper Aaron S. Cooper, Horn admitted to having shot the victim and informed the trooper of the location of the shotgun and the shells. Trial Transcript, Volume II, pages 166, 203 - 204.

Additionally, regardless of the inference, the State had proved malice, as one of the material elements of the second degree murder offense, beyond a reasonable doubt. Specifically, the testimonies of the State's witnesses showed the circumstances indicating that Horn acted with malice when he shot Kenneth Asbury. For example, Samual Amos, an eye witness, testified that when he was awakened by noise coming from the outside, he saw Horn walking to the side of the bridge with a shotgun and yelling that he was going to shoot. Trial Transcript, Volume II, pages 124 - 125. The illumination from the street light made is possible for Mr. Amos to clearly see Horn aiming a gun at a man, ready to shoot. Id. at 126. Amos distinctly saw that the man was unarmed and stood "completely across the wooden bridge" from Horn. Id.

Another witness, Douglas Asbury, testified that he pointed a shotgun at Ebbie Rambo when Ebbie started walking toward Douglas and Kenneth Asbury with a baseball bat and shouting profanities. Id. at 360, 361. Douglas Asbury further testified that Kenneth did not have a gun in his hand. Id. Instead of getting into an altercation with Ebbie Rambo, Douglas put the shotgun in the back of the truck, and he and Kenneth decided to leave. Id. As Kenneth was walking around the truck to the passenger side and Douglas was getting back into the truck, Douglas heard a shot which "sounded like from a pretty good distance away." Id. at 362. It was at that time that Kenneth said, "I've been shot." Id. Thereafter, Douglas walked around the truck to check on his brother, only to see that Kenneth was unconscious. Id. at 363. Importantly, according to Douglas Asbury, Kenneth did not have a shotgun or any kind of weapon in his hands when he was shot. Id.

Ebbie Rambo, a witness for defense, testified that the first time he learned that Kenneth Asbury had been shot was when the trooper arrived at the scene. Trial Transcript, Volume III, pages 501 - 502. On cross examination, Mr. Rambo admitted that he did not see where Kenneth Asbury was when the shot was fired. Id. at 514. Neither did Mr. Rambo see anyone pointing a shotgun right before the shot was fired. Id. In fact, according to Trooper Cooper's testimony, the shotgun was still in the back of the truck when he arrived at the scene almost immediately after the shooting. Trial Transcript, Volume II, page 200. Moreover, even Horn conceded that no testimony was offered at trial about a gunshot being fired other than the gunshot that killed Kenneth Asbury. Habeas Corpus Hearing, page 52.

Based on the testimony of all these witnesses and others, not mentioned in this memorandum, it is clear that Horn acted with malice when he shot Kenneth Asbury who was unarmed and who stood "completely across the wooden bridge" from Horn. Therefore, the State had provided sufficient evidence to prove beyond a reasonable doubt that Horn maliciously shot Kenneth Asbury.

(Id. , pp. 69 - 71.)

23

Under West Virginia law, second degree murder is murder that is not deliberate and premeditated homicide or a killing done in the process of committing a felony. See W. Va. Code § 61-2-1.[11] Second degree murder is defined as "the unlawful killing of another with malice." State v. Slonaker, 167 W.Va. 97, 102, 280 S.E.2d 212, 215 (1981). Malice is an essential element of murder in the second degree. State v. Scott, 206 W.Va. 158, 165, 522 S.E.2d 626, 633 (1999); State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995). West Virginia case law indicates that "the terms malice and intent may be used interchangeably." State v. Davis, 220 W. Va. 550, 594, 648 S.E.2d 354, 358 (2007). Malice is defined as "a subjective condition of mind, discoverable only by words and conduct, and the significance of the words and conduct of an accused person, . . . addresses itself peculiarly to the consideration of the jury." Syllabus Point 4, State v. Hamrick, 112 W.Va. 157, 163 S.E. 868 (1932); see also State v. Bonglis, 180 W.Va. 584, 378 S.E.2d 449 (1989)(finding sufficient evidence of malice where defendant exhibited ill will toward victim and threatened victim's companion with a gun). "Malice may be inferred from the intentional use of a deadly weapon; however, where the State's own evidence demonstrates circumstances affirmatively showing an absence of malice which would make an inference of malice from the use of a deadly weapon alone improper, a conviction for second degree murder cannot be upheld." Syllabus Point 2, State v. Brant, 162 W. Va. 762, 252 S.E.2d 901 (1979).

---

[11] West Virginia Code § 61-2-1 defines first and second degree murder as follows: Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

24

The standards established by the United States Supreme Court in determining the sufficiency of the evidence to support the jury's verdict are set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The focus of the analysis set forth in Jackson[12] is whether "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 307. In the underlying criminal action, Mr. Amos testified that Petitioner shot Kenneth, who was unarmed. (Document No. 10-4, Exhibit 6, pp. 3, 6 - 7.) Doug stated that Kenneth was unarmed and leaving the area when he was shot by Petitioner. [13] (Document No. 10-6, Exhibit 6, pp.

---

[12]In *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), the West Virginia Supreme Court of Appeals adopted the analysis set forth in *Jackson* to determine whether the evidence was sufficient to support the jury's verdict.

[13]  Douglas Asbury testified as follows:

A    I pointed the shotgun at him, and then, something just told me, said that it's not worth it, and I threw the shotgun back in the back of the truck, and proceeded - We were getting in the truck to leave.

Q    You started to get in on the driver's side?

A    Yeah, Kenneth went around to the passenger side.

Q    At that point or by that point, have you seen Dave Horn?

A    No, sir.

Q    Had you said anything to Dave Horn?

A    No, sir.

Q    Had you said anything to Dave Horn?

A    No, sir.

Q    As you were getting back in your truck, were you planning on going out of the bottom and leaving?

A    Yes, sir.

Q    What happened next?

A    Ebbie started shouting more profanities, and I shouted some back at him, then I heard a shot – a shot it wounded like form a pretty good distance away. At that time, my brother said, "I've been shot." And I proceeded to go around the truck and try to help him.

(Document No. 10-6, Exhibit 6, pp. 34 - 35.)

34 - 35.) Trooper Cooper testified that when he arrived on scene, "I was confronted by Mr. Horn, and he advised that I was the one he was looking for and advised that he had shot the victim." (Document No. 10-4, Exhibit 6, p. 83.) Although Ebbie testified that Kenneth had a shotgun at one point prior to the shooting, Ebbie acknowledged that at the time of the shooting "I didn't see Kenneth, and I know Doug did not have a gun."[14] (Document No. 10-7, Exhibit 6, p. 85.) The undersigned finds that Petitioner is incorrect in his assertion that Doug admitted Kenneth aimed the gun at Ebbie and that Dr. Sabet testified Kenneth was standing in a "shooter stance" when he was shot.[15] (Document No. 10-6, Exhibit 6, pp. 34, 103.) Based on the foregoing, the undersigned finds that the testimonial evidence presented at trial was enough for any jury to have found the element of malice beyond a reasonable doubt. The evidence clearly supported a finding by the jury that Kenneth was unarmed and leaving the area when he was shot by Petitioner. The jury, as trier of fact, had the responsibility to weigh the evidence and to draw reasonable inferences therefrom, and to resolve any conflicts that may have appeared in the testimony. Accordingly, the undersigned finds that the State *habeas* court's decision was neither contrary to, nor an unreasonable application of clearly established federal law, and Respondent is entitled to summary judgment on this claim.

**C.      Motion for Continuance.**

Petitioner alleges that the trial court erred by denying his Motion to Continue. (Document No. 1, p. 6.) Specifically, Petitioner states that "[t]here was gunshot residue forensic test and it was

---

[14]  Ebbie stated that "I seen Kenneth with a gun when he was coming out of the truck with it in Third Bottom." (Document No. 10-7, p. 85.)

[15]  Doug testified that "I pointed the shotgun at him." (Document No. 10-6, Exhibit 6, p. 34.) Dr. Sabet described the trajectory of the gunshot as follows: "This is a shotgun, and a shotgun injury, the direction was front to back because of the fragmentation pieces and from left slightly left to right. So, the direction was just front to back and slightly left to right." (*Id.*, p. 103.)

not delivered until the day at trial and the court did not give a continuance to have an expert to examine the State's evidence." (<u>Id.</u>) Petitioner contends that trial should have been continued in order to allow Petitioner the opportunity to conduct an independent gunpowder residue test on the victim. (Document No. 15, pp. 8 - 10.) Petitioner states that "[t]he presence or absence of gunpowder residue on the victim is significant." (<u>Id.</u> , p. 9.) Petitioner alleges that "the delay in providing the report to defense counsel was intentional and a violation of the prosecutor's on-going duty to divulge scientific test." (<u>Id.</u> , p. 11.)

In response, Respondent first argues that "there was no request for a continuance." (Document No. 11, p. 10.) Specifically, Respondent states that "Petitioner cites nothing in the record of the trial or other proceedings where a motion for a continuance was made." (<u>Id.</u> ) "Regardless, a denial of a continuance to conduct this independent analysis of gunpowder residue on the victim in no way constituted a myopic insistence upon expeditiousness in the face of a justifiable request for delay, assuming *arguendo*, that such a motion occurred." (<u>Id.</u> , p. 11.) Respondent further asserts that the prosecutor did not have the test results "until the Thursday or Friday before the trial commenced, and that it sent these results to the Public Defender's Office as soon as it received them." (<u>Id.</u> ) Respondent points out that there was no evidence that more than one shot was fired on the night of the murder, and it was undisputed that Petitioner fired that shot. (<u>Id.</u> ) The State *habeas* court found as follows:

> At the trial, Mr. Mancini, Horn's counsel, admitted that Mr. Bell promptly faxed the results of the gunshot residue to Mancini's office. Trial Transcript, Volume II, page 89. In fact, Mr. Bell's fax machine transmission sheet showed that the fax went through. <u>Id.</u> However, the defense counsel never received the fax due to the malfunction of Mr. Mancini's fax machine. <u>Id.</u> Based on that, Mr. Mancini move for a three day continuance in order to examine the gunshot residue kit. <u>Id.</u> at 90. However, the Court refused to grant continuance stating that the Court had not set a discovery deadline date and, therefore, Mr. Bell's fax to Mancini on Friday, April

6, 2001, was timely. Id. at 91.

    Clearly, Mr. Bell was not required to disclose the evidence to the defense before a certain date. The date on the report is March 20, 2001, and even Mr. Mancini admitted that Mr. Bell faxed the gunshot residue on Friday, April 6, 2001, which was as soon as it became available to the State. Additionally, as evidenced by Mr. Bell's fax transmission sheet, Mr. Bell had no way of knowing that Mr. Mancini's fax machine had malfunctioned and that the defense was surprised by the report or that it was prejudicial to Horn. In making his motion for continuance or a recess until Thursday, April 12, 2001, Mr. Mancini requested time to examine the results of the gunshot residue test independently. Id. at 92. However, the Court indicated that the State's witness was going to testify about the results the next day and that Mr. Mancini could still examine the gunshot residue kit. Id. at 91 - 92.

    Furthermore, the report stating that Kenneth Asbury had no gunshot residue on him was actually unfavorable to Horn because it contradicted Horn's argument that Kenneth Asbury was armed. Accordingly, based on the foregoing, the State delivered the gunshot residue report, which was not even exculpatory or favorable to Horn, to the defense as soon as possible and the fact that the defense did not receive it until the first day of the trial was not prejudicial to Horn.

(Document No. 10-2, Exhibit 6, pp. 72 - 73.)

It is well established that courts have the "right to control their docket and require that cases proceed in an orderly and timely fashion, and to that end to deny motions for continuances." United States v. Inman 483 F.2d 738, 740 (4th Cir. 1973). In Hill v. Ozmint, 339 F.3d 187, 196 (4th Cir. 2003), the Fourth Circuit established a two-part test to determine if a due process violation results from the denial of a continuance:

    First, he must establish that the trial court "abused its discretion in denying his continuance motion. Ungar v. Sarafite, 376 U.S. 575, 588 - 89, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Morris v. Slappy, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Although a "matter of continuance is traditionally within the discretion of the trial judge," a trial court is not entitled to deny a continuance because of a "myopic insistence upon expeditiousness in the face of a justifiable request for delay." Ungar, 376 U.S. at 589, 84 S.Ct. 841. Second, to be entitled to relief, the defendant must establish that the trial court's erroneous ruling prejudiced his defense. United Sate v. Colon, 975 F.2d 128, 130 - 31 (4th Cir. 1992).

Hill, 339 F.3d at 196 - 97.

Based upon a thorough review of the record, the undersigned finds that Petitioner has failed

to satisfy the test set forth in <u>Hill</u>. First, the undersigned finds that the trial court did not "abuse its discretion" in denying Petitioner's continuance motion. The trial court determined that the State provided the gunpowder residue results to defense counsel as soon as the test results were received by the State. Although defense counsel did not receive the results until a few days later, defense counsel acknowledged that he was orally informed by the State that the test results were negative. The trial court denied defense counsel's motion for a continuance finding that there was no deadline set as to the disclosure of the gunpowder residue results and the State's disclosure was timely. During the underlying criminal trial, the following dialog occurred concerning the motion for a continuance:

> MR. MANCINI:    And the third item was there apparently was a gunpowder residue test performed on the victim. I was informed by Mr. Bell last week – last week that that particular test had been performed; that he had been told by Sergeant Giacalone –
>
> MR. BELL:    (Interposing) Giacolone.
>
> MR. MANCINI:    - - that the results had been negative and that he would forward me the results as soon as he got them, probably the next day. That next day or the day after would have been last Friday, and apparently, Mr. Bell did receive them and promptly faxed them. His fax transmission sheet shows that it was faxed okay. Our fax machine was down; so it was never received.
>
> We would like an opportunity, perhaps till Thursday, to review that and, perhaps till Thursday, to review that and, perhaps, have it tested ourselves.
>
> THE COURT:    Have what tested?
>
> MR. MANCINI:    The gunpowder residue.
>
> THE COURT:    You mean by an independent person?
>
> MR. MANCINI:    Yes, Sir.

29

MR. BELL:         Your Honor, Sergeant Giacalone is going to be here tomorrow to testify about that, and we, certainly, would ask him to testify about that particular examination. If they want to do so something on the defense's part, I mean, that's - - we wouldn't have any problem with that.

MR. MANCINI:      We've yet to – I've seen it now. We've yet to receive it, not because Mr. Bell didn't send it, although last Friday would have been a bit late, but –

THE COURT:        That's not the fault of the State, is it, I mean, because your machine, your fax machine was down, is it?

MR. MANCINI:      Either way we didn't receive it.

THE COURT:        What?

MR. MANCINI:      Either way, we didn't receive it. Regardless, we didn't receive it. How can we read it if we've never received it?

THE COURT:        I though you said you didn't receive it because your fax machine was inoperable.

MR. MANCINI:      That's correct.

THE COURT:        That was no – That was not the fault of the State, was it?

MR. MANCINI:      Well, I don't know if that was the fault of anybody –

THE COURT:        I mean, they didn't come to your office and mess up your machine, did they?

MR. MANCINI:      No, but of course, they have a duty to provide us with the evidence, and if they provided it – Well, even they provided it but it didn't actually get provided. We don't see how that falls on us, even if he had and we had gotten it last Friday, what kind of preparation would that have given us until today to meet it?

THE COURT:        Did I put a limit on when you were supposed to get it? When he was supposed to turn it over?

MR. MANCINI:      I don't recall if that was mentioned at the last pretrial, Sir.

30

| THE COURT: | I mean, if he has a witness coming, I'm going to let the witness testify, unless you have time to do something else with it. That's up to you, but I'm not going to preclude his witness from going on and testifying about it. |
|---|---|
| | You have the results, don't you? |
| MR. BELL: | Yes, Your Honor. |
| MR. MANCINI: | And if we wanted to have it tested independently? |
| THE COURT: | You can try and do that. Is it adverse to the defense? |
| MR. BELL: | It just shows that there's no evidence of gunshot reside on the victim. |
| THE COURT: | On the victim? I'm going to – I'm going to let him use that. I mean, I don't know what you could have done once you got it Friday, if you had gotten it Friday, I'm not going to get into that, but if I didn't have a limit on – if I didn't already have a prescribed limit of when he was to turn that over to you, you know, you're just going to have to deal with it the best way you can. |
| MR. MANCINI: | Yes, Sir. |
| THE COURT: | In other words, I didn't say he had to have it to you two weeks ago or a week ago. |
| MR. MANCINI: | I don't recall a specific date. |
| THE COURT: | All right, anything else? |

(Document No. 10-3, Exhibit 6, pp. 90 - 93.)

Second, even assuming the trial court erred by denying Petitioner's request for a continuance, the undersigned finds that Petitioner fails to prove how his defense was prejudiced. A thorough review of the trial transcripts fails to reveal any evidence indicating that more than one shot was fired on the night of Kenneth's death. Although there was testimony that Kenneth had possession of a shotgun at one point during the night of his death, there was no evidence that he fired the

shotgun. The testimony indicated that one gunshot was fired, and Petitioner admitted that he fired

that gunshot. Additionally, there is no evidence discrediting the results of State's gunpowder residue

test. Petitioner merely speculates that independently testing would have revealed different results.

Moreover, the undersigned notes that the negative gunpowder residue results did not preclude

Petitioner from proceeding on his defense theory that Kenneth was armed and Petitioner was acting

in self-defense. Sergeant Giacalone testified that "[m]y findings does not exonerate somebody from

being involved with a firearm. The fact that I'm not finding it, there are reasons which I explained

why I'm not finding it, and yet there still could have been activity which I suggest." (Document No.

10-6, Exhibit 6, p. 11.) Based on the foregoing, the undersigned finds that the State *habeas* court's

decision was neither contrary to, nor an unreasonable application of clearly established federal law,

and Respondent is entitled to summary judgment on this claim.[16]

## D.    <u>Ineffective Assistance of Counsel.</u>

The standards established by the United States Supreme Court in determining whether or not

a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth

in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective

assistance of counsel claims consist of mixed questions of fact and law. <u>Id.</u> Under the two-pronged

standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below

an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so

as to render the results of the trial unreliable. <u>Id.</u> at 687-91, 104 S.Ct. at 2064-66. Counsel's

---

[16] To the extent Petitioner is alleging a *Brady* violation, the undersigned finds the claim to be without merit. Clearly, the negative gunpowder residue test for the victim was unfavorable to Petitioner. Under the *Brady* rule, the prosecution is only required to disclose evidence that is favorable to a defendant. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196 - 97,10 L.Ed.2d 215 (1963).

performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), aff'd, 985 F.2d 553 (4th Cir.) cert. denied, 506 U.S. 1087, 113 S.Ct. 1069, 122 L.Ed.2d 372 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel.

The State *habeas* Court properly applied the standards set forth in Strickland, and determined that trial counsel was not ineffective. (Document No. 10-2, Exhibit 6, pp. 73 - 75.) Specifically, the State *habeas* court found as follows:

> [I]n not calling Horn to the stand, Mancini possibly used a strategy to avoid cross-examination of Horn and also to further Horn's defense theory through the statement Horn gave to Trooper Cooper where he admitted to shooting Kenneth Asbury in defense of a third party. However, while Mr. Mancini's failure to offer a jury instruction on a third party defense could be viewed as a tactical decision in conducting Horn's defense, it could also be interpreted as an error. Id. at page. 36.
>
> Nevertheless, because the Strickland test if twofold, even if Horn could prove serious errors taken by his counsel, he still has the burden to "affirmatively" show prejudice: the existence of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. In other words, Horn has to prove that had it not been for errors committed by Mr. Mancini, the outcome of the trial would have been in his favor, thus planting reasonable doubt in the minds of the decision-makers regarding his guilt in the commission of the murder.
>
> Ultimately, the inquiry then becomes whether there is "a reasonable probability" that the jury would have acquitted Horn but for the errors of Mr.

Mancini. The answer to that question would be negative according to the two-prong Strickland test because even if Mr. Mancini's errors were so serious as to satisfy the first prong of the Strickland test, these errors did not prejudice Horn in denying him a fair trial. In fact, the State had enough evidence to prove Horn's guilt in the second degree murder beyond a reasonable doubt, and no reasonable probability existed for the jury to find in his favor, but for errors of his defense counsel. The United States Supreme Court defined reasonable probability as "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. Hence, in evaluating the ineffectiveness of counsel, and "[t]aking the unaffected [by counsel's errors] findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Id. at 696, 2069.

Assuming arguendo that some aspects of Mr. Mancini's handling of Horn's case were errors that could have possibly affected some of the findings in the case, Horn was not prejudiced by such errors because the outcome of the trial would have been the same absent the errors due to enough evidence offered by the State to convict Horn of murder in the second degree. In sum, Horn has failed to prove that Mr. Mancini was ineffective in his defense of Horn because Horn has failed to prove that he was so prejudiced as to having been denied a fair trial.

(Id., pp. 74 - 75.)

**1.    Trial Counsel's Failure to offer Jury Instruction.**

First, Petitioner complains that trial counsel acted ineffectively by failing to "give a jury instruction on a third party defense." (Document No. 1, p. 9.) Petitioner alleges that counsel's failure "limited the jury in its consideration, and denied the petitioner the right to mount a defense, as the defense of others, to lessen the degree of punishment or to possibly obtain a judgment of acquittal from the jury." (Document No. 15, p. 13.) Petitioner states that the "third party defense" instruction should have been given because there was testimony that Doug and Kenneth were "armed with a shotgun [and] were searching for one, Ebbie Rambo, to kill him." (Id.)

In response, Respondent argues that "Petitioner has failed to demonstrate he suffered any prejudice from counsel's putative failure to offer an instruction regarding a third party defense as a defense to a murder conviction." (Document No. 11, p. 17.) Specifically, Respondent states that

"a third party defense was indeed inapplicable, and its absence in the instruction in no way prejudiced Petitioner in his defense." (Id., p. 16.) Respondent notes that "no one testified that there was another gun fired other than that of Petitioner" and the testimony revealed that Kenneth was leaving the area at the time he was shot. (Id.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State *habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The undersigned notes that a third party defense instruction must be supported by a foundation in the evidence. United States v. Hicks, 748 F.2d 854, 857 (4th Cir. 1984); State v. Cook, 204 W.Va. 591, 515 S.E.2d 127 (1999). A review of the trial transcript reveals that Kenneth and Doug were attempting to leave the property at the time of the shooting. According to the testimony, Doug and Ebbie were merely yelling profanities at one another just prior to the shooting. Ebbie acknowledged that he continued to argue with Doug because "I knew I was out of range there." (Document No. 10-7, Exhibit 6, p. 84.) Although there was testimony that Doug warned Ebbie that "this isn't over" earlier in the day, Mrs. Horn was the only witness who testified that she saw Kenneth with a gun just prior to the shooting. Mrs. Horn, however, testified that Kenneth had the gun pointed toward Petitioner when she "heard the shot" and she "had to look to see if it was Dave that had been shot."[17] (Document No. 10-8, Exhibit 6, p. 49.) Additionally, Petitioner never indicated in his statement to Trooper Cooper that he shot Kenneth in defense of Ebbie.[18] (Document No.10-5, Exhibit 6, pp. 36 -

---

[17]   The undersigned notes a self defense instruction was given to the jury. (Document No. 10-9, Exhibit 6, pp. 40 - 42.)

[18]   Petitioner made statements to Trooper Cooper indicating that he had acted in self defense. Petitioner made the following statements to Trooper Cooper:
> Question: Did you feel threatened by the other guys? Answer: Yeah, I thought that
> if I didn't do something to stop the fighting, my family may have been hurt . . .
> Question: Did the guy with the gun aim it at you? Answer: When I told the guy I had

38.) Moreover, there is no evidence that Petitioner was prejudice by trial counsel's failure to request a third party defense instruction. Petitioner is merely speculating that a third party defense instruction would have resulted in his acquittal. Accordingly, without determining whether counsel's performance was deficient under the first prong of the <u>Strickland</u> analysis, the undersigned finds that Petitioner has not established prejudice under the second prong and therefore, Respondent is entitled to summary judgment on this claim.

### 2.    Trial Counsel's Advice Not to Testify.

Petitioner alleges that trial counsel was ineffective because counsel "did not let me testify after I told him I wanted to." (Document No. 1, p. 9.) Specifically, Petitioner states that "[d]efense counsel did not put petitioner on the stand to testify even though petitioner had expressed his desire to testify." (Document No. 15, p. 14.) Petitioner contends that trial counsel's advice that Petitioner not testify was not part of trial strategy. (<u>Id.</u>) Petitioner asserts that he had a constitutional right to testify in own defense in his underlying criminal trial. (<u>Id.</u>, p. 15.) In response, Respondent contends that "[t]he advice Petitioner's counsel gave for him not to testify was indeed trial strategy and did not prejudice his defense." (Document No. 11, p. 17.)

Petitioner has failed to provide any evidence rebutting the State *habeas* court's findings of fact and conclusions of law, which are presumptively correct. Defense counsel's advice concerning whether a defendant should testify in his defense is a fundamental trial decision, which cannot be challenged as evidence of ineffective assistance of counsel. <u>Carter v. Lee</u>, 283 F.3d 240, 249 (4th Cir.

---

called the law, he brought the gun up like he may shoot. He had the gun to this side to start with, but when I told him I was going to call the law, he swung the gun up and put the other hand on it. That's when I shot. When I saw the gun move, I thought he was going to shoot.

(Document No. 10-5, Exhibit 6, pp. 37 - 38.)

2002), cert. denied, 537 U.S. 897, 123 S.Ct. 196, 154 L.Ed.2d 166 (2002); also see Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983), cert. denied, 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984)(stating that "[c]ounsel's advice not to testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.") Furthermore, Petitioner fails to establish that prejudice resulted from trial counsel's advice that Petitioner not testify at trial. Petitioner merely speculates that he would have been acquitted or convicted of a lesser included offense had he testified in his defense. The transcript of Petitioner's criminal trial reveals that Mr. Amos testified that he saw Petitioner shoot Kenneth and Trooper Cooper testified that Petitioner confessed to shooting Kenneth. Thus, Petitioner would have been subjected to extensive cross-examination, and possibly impeached had he taken the stand. Accordingly, Petitioner has failed to establish either prong of the Strickland analysis and therefore, Respondent is entitled to summary judgment on this claim.[19]

---

[19] To the extent Petitioner is alleging that the trial court failed to advise him of his right to testify, the undersigned finds this claim to be without merit. (Document No. 10-7, pp. 12 - 13.) Specifically, the trial court advised Petitioner as follows:

| THE COURT: | Okay, Mr. Horn, do you understand you have the right to take the witness stand and testify at your trial? |
| DEFENDANT: | Yes, I do. |
| THE COURT: | And if you decide to take the witness stand, do you understand that no one can prevent you from taking the witness stand and testifying? |
| DEFENDANT: | Yes, Sir. |
| THE COURT: | If that's your decision. |
| DEFENDANT: | Yes, Sir. |
| THE COURT: | Do you, also, understand you have a right not to take the witness stand, a constitutional right not to take the witness stand and testify at this trial? |
| DEFENDANT: | Yes, Sir. |
| THE COURT: | If you choose not to take the witness stand and testify at this trial, I will instruct the jury not to hold that against you even in the slightest degree. Do you understand that? |
| DEFENDANT: | Yes, Sir. |

**E.    Defective Indictment.**

Finally, Petitioner argues that "[t]he Indictment charging me with murder in the first degree was defective." (Document No. 1, p. 39.) Petitioner contends that "West Virginia law does not have [any] such thing as an indictment for first degree murder. . . The indictment is for murder with the degree dependent upon the evidence presented at trial." (Id.) In response, Respondent asserts that "the indictment was sufficient and not defective as Petitioner contends, and he should be denied habeas relief on this basis." (Document No. 11, p. 19.) The State *habeas* court found as follows:

> In the case at bar, the indictment charged Horn with murder in the first degree. However, the language of the indictment adequately informed Horn of his charge:
>
>> Charge: Murder of the first degree.
>> That on or about __ day of July, 2000, in the said Court of McDowell, DAVE THOMAS HORN did feloniously, unlawfully, intentionally, maliciously, wilfully, deliberately and premeditatedly, with the use of a firearm, kill, slay and murder one Kenneth Asbury, in violation of West Virginia Code § 61-2-1, as amended, against the peace and dignity of the State.
>
> The indictment provided for all the elements listed in the underlying statute, thus putting Horn on notice that a homicide was committed "feloniously, unlawfully, intentionally, maliciously, wilfully, deliberately and premeditated." (Emphasis added). Accordingly pursuant to Hall, the language of this indictment is sufficient to support first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter.
> Moreover, Horn was not prejudiced by this indictment because in giving jury instructions, the Court specifically instructed the jury that, under the indictment, they could find Horn guilty of murder of the first degree, murder of the first degree with

---

| THE COURT: | Do you, also, understand that, if you decide to take the witness stand and testify at this trial, that you will be cross examined by Mr. Bell? |
|---|---|
| DEFENDANT: | Yes, Sir. |
| THE COURT: | I need for you, Gentlemen, to retire and go over those same rights with your client to make sure he understands, and at some point, I'm going to need to know whether or not you're going to take the witness stand and testify. |

(*Id.*)

mercy, murder of the second degree, voluntary manslaughter, involuntary manslaughter, or not guilty. The court further instructed the jury that they had to decide what decree of homicide Horn committed, based upon all the evidence presented before the jury at trial. The jury, after evaluating all the evidence, decided that Horn did not shoot Kenneth Asbury with premeditation and deliberation; instead they found that Horn acted with malice, therefore, returned a guilty verdict of second degree murder. Therefore, the indictment charging Horn with murder in the first degree was not defective.

(Document No. 10-2, Exhibit 6, pp. 77 - 78.)

The Fourth Circuit has recognized that "[v]ariances and deficiencies in state indictments are not ordinarily a basis of federal habeas corpus relief unless the deficiency makes the trial so egregiously unfair as to amount to a deprivation of the defendant's right to due process." Ashford v. Edwards, 780 F.2d 405, 407 (4th Cir. 1985.) Due process requires that an accused be informed of the specific charge against him. See Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948); see also In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)(stating that "[a] person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense . . . are basic in our system of jurisprudence"). "It is generally sufficient that an indictment sets forth an offense in the words of the statute itself, as long as 'those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

Petitioner has failed to provide any evidence rebutting the State *habeas* court's findings of fact and conclusions of law, which are presumptively correct. First, to the extent Petitioner is claiming that his Indictment was defective under West Virginia law, his claim is not cognizable in federal *habeas* corpus. Wright v. Angelone, 151 F.3d 151 (4th Cir. 1998)(citing Wills v. Egeler, 532 F.2d 1058, 1059 (6th Cir. 1976)(stating that the "[d]etermination of whether a state court is vested

with jurisdiction under state law is a function of the state courts, not the federal judiciary")); <u>also see</u> <u>Estelle</u>, 502 U.S. at 67 - 68, 112 S.Ct. at 475 (stating that "[i]t is not the province of a federal habeas corpus court to reexamine state court determinations on state-law questions.") Next, the undersigned finds that Petitioner's Indictment satisfied the requirements of due process by adequately informing Petitioner of the specific charge against him. Specifically, the Indictment charged that Petitioner "feloniously, unlawfully, intentionally, maliciously, wilfully, deliberately and premeditatedly, with the use of a firearm, kill, slay and murder one Kenneth Asbury, in violation of West Virginia Code § 61-2-1." Thus, the Indictment set forth the charge against Petitioner in the words of the statute, which "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." Based on the foregoing, the undersigned finds that the State *habeas* court's decision was neither contrary to, nor an unreasonable application of clearly established federal law, and Respondent is entitled to summary judgment on this claim.

## **PROPOSAL AND RECOMMENDATION**

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion to Dismiss or in the alternative for Summary Judgment (Document No. 10.), **DISMISS** Petitioner's Petition (Document No. 1.) and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of

40

objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Petitioner.

Date: February 26, 2009.

R. Clarke VanDervort
United States Magistrate Judge

41